Good morning, Your Honors. Lyle Mink for the appellant, Mark Silver. I'd like to reserve a couple of minutes, Your Honor. For a rebuttal? Sure. Thank you. Your Honor, I'd like to highlight the facets of this case that I think the Court should focus on. How much money are we talking about? By now, it must be close to $300,000. Well, give me your best guess. It's $3,000. It's about $3,000. No. It's several hundred thousand dollars, between $200,000 and $300,000. Several hundred thousand? Yes, sir. Five hundred thousand? No, not five. It's between $200,000 and $300,000. Okay. And way back in 01, it was not very much, but now it's accumulated. Well, what you could help me with on this, in terms of the way that you could spend your time, is similar to a case that we had before. There's obviously a lot of things wrong with your client, and there were a lot of things wrong with him over a period of time, of which during that period of time, he continued to work, even though some doctors told him not to work. And then it seems that in December, I think it was December 14th or something, that they fixed the date for when supposedly we're talking about what was wrong. And so then we have the 90-day period. And so the issue of whether he could go back to work, whether it had been resolved or what had happened, on the form, I think it said angioplasty and in the hearing, there are certain findings that are made that they say that he recovered from the angioplasty and he could have gone back to work, right? Did you say the hearing, Your Honor? Or, well, the, what, in a district court or? Yes, if that's what you're referring to, the angioplasty. Yes, yes. In terms of deference that were required to make for some factual findings and how the hearing was handled, you know, how, you know, how do we get past some of those things that seem to resolve differences of opinions or differences of doctors or what his condition was? The findings of fact that were signed by the trial judge were almost a rubber stamp of what the defense submitted. In fact, in my opening brief, I'm pretty sure it's in my opening brief because sometimes I get caught up between the opening and the reply. I even call that to the attention, and I cite the exact pages, and I say it's almost word for word. So basically at that point in time, the test is particularly close scrutiny of those The reason this appellate brief is so long is because I had to go through and show that there is no support, there's no substantial evidence, there's no support for those key findings. For example, the word recovers, the Court just used. There is nothing in the record that, no medical records, no opinion of any expert that says he recovered. This is the case, Your Honor, where, as Your Honor said, he suffered, they've admitted, I believe, he suffers from serious heart disease. They don't dispute his medical history. They don't dispute the qualifications of his cardiologist. His cardiologist is a, took care of him for 23 years. He's a respected clinical professor at UC Irvine and told him not to go back to work. Is that Dr. Tonkin? Yes. There's no dispute that the job is stressful. That was admitted for the first time at trial. There's no dispute that, or can there be, that workplace stress increases the risk of another cardiac event. That's not disputed. Mr. Silver followed his doctor's advice. I mean, that's the common care and And I cited it in the opening pages of my brief, who said, you know, the risk of relapse is in itself a disability. And that's the Cohn and Lassner cases, the seminal cases in this area, Your Honor. And in fact, the facts in Cohn are very close to this, even though the plaintiff in Cohn was a lawyer. So, and by the way, this is not new. Jackway is not new. It cites, Judge Mathis cites a 1938 California case that says something substantially similar. And even in the unpublished decisions of this court, pretty much say the same thing. So then we have the Social Security Administration that grants him total disability. They find, and this is in my brief and I cited the excerpts of records, that the man is credible. This is not a, this is, you know, they, trial, they try and say, well, he's not credible because he's doing this and that. The Social Security actually looked at him, and they said he's credible. And yet, they excluded, the judge excluded the awards, the Social Security award letter that, you know, when I got the Social Security file, I immediately sent it to UNUM, and I realized later that it didn't have the award letter in there, and I wanted to follow up, because that's the final paper, and they wouldn't accept it. And the judge, the trial judge wouldn't accept it. Well, they denied his claim without examining him. They never laid an eyeball on him. They didn't even hire an independent cardiologist to look at him. They didn't hire an independent cardiologist to look at his medical records. What do they have? They have the in-house cardiologist who looks at the medical records, and by the way, when they ask for the medical records, they ask for them only after December of 2000. They don't go back and say, give us everything. We want to see your history. We want to see the bypasses. We want to see the angiograms. We want to see all this other stuff. No, they only ask for the stuff prospectively going forward. I was the one who had to give them the back stuff. That's why the record's so big. Well, was this analyzed from the standpoint of that the disability that he was recovering from, his December 14, 2003 angioplasty, is that how it was analyzed, or was it analyzed from the fact of whether he was recovering from his cardiac problem? Your Honor, I'd love to answer your question, but I don't know. What we have in this case, this is all we have from Unum, is four very terse memos from the in- house cardiologist who apparently goes to the record and it was almost like you put them on your computer and you look for words. They look for good and improved and things of this nature out of context. And they totally disregarded the opinion of Dr. Tonkin, and this is what we have. They have the in-house cardiologist. This is not the first case this has happened. This has happened in a lot of cases with not only Unum and other companies where they use the in- house cardiologist, but also other people, and they start minimizing or even disregarding the decisions of the own participants' cardiologist. Now, by the way, this doctor would be able to do that. The way we have to look at it, though, if we accept the standard of review in this case as abuse of discretion with special scrutiny, am I right on that?  Excuse me. Well, with the district court's conclusion that Silver did not provide sufficient evidence to support a finding that he was disabled throughout the 90-day elimination period, isn't that what we're looking at? I apologize, Your Honor. I wanted to check something in my brief because I'm sorry. What was the court's question? Well, you're saying that the standard of review of everything is de novo? Yes. It's clear that the district court reviews it de novo, but then how do we review the district court? I think that's thank you, Judge Fletcher. I'm sorry. Then that's correct. Well, you have to review the district court's findings with particularly close scrutiny. That's right. Yeah. Abuse of discretion with an overlay. Yes. Special scrutiny. Yes. And, again, the reason it took me so much time and pages to go through this is I had to show that there is no substantial evidence to support these findings which were basically rubber – I mean, it was a rubber stamp of what Unum turned in. There is no expert, no independent expert who said that this man recovered. It's just not there. And, in fact, if you go to the catheterization in May of 2001, his left ascending – left coronary artery was 100 percent occluded.  He still had major occlusions. Yes, they say, well, they had bypasses, but he doesn't have the use. I mean, they can't – these medical records don't show that his arteries automatically opened up. It just – it just – I don't know how anybody could conclude that he recovered. And there is no – they can't point to anything in the record, any substantial evidence, a medical record to say it's his – he recovered. Now, with respect to – Well, essentially, you have to be – you have to – to prevail, you have to have a finding that he was disabled throughout the 90-day elimination period. Correct. Correct. So just so that we don't – Yeah. And – – turn things around. I cited a case on that. It was the only case I could find. It's in my brief. It's the Flood case. And the Court there recognizes, and that's on page – pages 41 and 42 of my brief, that it was kind of a similar case. The defense said, well, the plaintiff wasn't disabled continuously because she had improved. And they said, okay, she improved. What does that mean? The Court said, well, yeah, she had made some improvements, but she was still disabled. And the Court said it's not illogical to improve but still be disabled. Patients' conditions vacillate somewhat from day to day, week to week, just as a person's mood may vacillate. And then the Court there, as here, noted that the defense selectively relied on comments by the plaintiff's treating physicians, yet disagreed with their conclusion that they were incapable of working. Well, here you have the same thing. You've got selective parsing of the record. You've got them agreeing with Dr. Tonkin that he should have cardiac rehabilitation, but after the cardiac – and he should stay away from work, but after the 12-week rehabilitation, he can go back to work. It makes no sense at all. They gave no reasons. If you look at the four first memos by Dr. Wu – and by the way, this is the same Dr. Wu, the same Dr. Wu in Bowers v. Unum Providence that I cited who – and they rejected her opinions in that decision for doing the same thing. Same doctor, pretty – not exactly the same thing, but pretty close to the same thing, and they were rejected. So we have a situation where we've got guideposts. We've got what happened to him in December, and this is after a long period. And just because he worked, Your Honor, I know you mentioned this earlier, the Hawkins case out of the Seventh Circuit – and I'm sure there are some cases here, but that's a good case – says just because a person works doesn't mean they're not disabled. You know, he went as far as he could, and finally, after all this time, his cardiologist who had been seen for 23 years said, you know, enough's enough already. You're not – you can't go back to work. All right. The initial form – and then you might want to reserve some time to see what Appelli's position specifically is so you can respond. But the initial form that he fixes the date of December 14th, he says on it, is it angioplasty, and he says cardiac – it's a – what does he say his disability is? He says heart problems and angioplasty. Angioplasty. It's heart disease, and it – Heart disease. It's heart disease. Okay. Do you want to reserve the balance of your time? Yes, Your Honor, I would. Thank you. Just a little remark. You say your chief expert is a noted professor at UCI. He's a respected professor, a clinical professor of medicine. At UCI Hospital. Yes. Well, the Orange County Papers recently have condemned the UCI Hospital to the point where it maybe should close. Well, I don't know about that, Your Honor, but, you know, I only know about Dr. Tonkin. I don't know – I don't know what – why they said that, what the reasons were. It's a pretty broad – a pretty broad statement. You're familiar with all the problems there. I'm sorry? You're familiar with all the problems at UCI. No, no. I'm just – I'm not – I'm not familiar with them. But this is – this has to do with a very specific issue. I understand. Thank you, Your Honor. Good morning, Your Honors. Stacey Turner on behalf of defendant and appellee, Executive Car Leasing Long-Term Disability Plan. Possibly what would be helpful to me on this is – I mean, obviously we see a lot of different cases, and, you know, there are people that, you know, I have to say over, you know, that – I mean, they really don't have very much wrong with them, or there are indications of – you know, there's interpretations of either they're faking or they're over-amping or whatever. This person appears to be a very sick individual with a lot of health problems. Is – but then as I've gone over with appellant's counsel, I'm, you know, over the standard of review. How is this person not disabled during the – And if you're talking about just the angioplasty, okay, did he recover from the angioplasty, but if he also listed heart disease, how is he better from his heart disease? Thank you, Your Honor. I appreciate the opportunity to address your specific concerns. Coronary artery disease is not, as a diagnosis, in and of itself, a disability. The trial court found that. Dick Cheney is a wonderful example of that. Many people live and work, millions of them perhaps, with coronary artery disease on a daily basis. The issue is whether that disease is manifesting itself in a way that precludes you from working. And in looking at that, the district court looked at test results, objective test results conducted by plaintiff's own physicians, by his surgeons, looked at the treatment notes of his treating physician, Dr. Tonkin, went through those exhaustively, including the medications that he was being prescribed before and after the angioplasty, looked at the strength of his heart, whether he could exercise and to what extent he was continuing to exercise, looked at all of those things. De novo, did not defer to UNUM in this instance. And I think that's important to focus on as well. That the court, this isn't your garden variety ERISA case. This court took three days of trial, reviewed ten rounds of briefs, or five rounds of briefs, ten briefs total from the parties, reviewed a 2,600-page administrative record, the entirety of which is not before this court, although it was designated as part of the record on appeal. These issues have been briefed, explored, and examined thoroughly by the underlying court. I understand that the standard of review here is clearly erroneous, with close scrutiny to the record, because the court adopted UNUM's findings. I have two points to raise with regard to that issue, specifically that the findings were adopted because they were based upon the court's observations and comments over a three-day period of trial. That's one issue. And the second issue I've already mentioned, which is that the entirety of the administrative record is not before this court. It was not designated in the excerpts of record by appellant. So don't yes. Ginsburg. Counsel, we can always ask for more. The whole record is before us. The excerpts are simply pointed to by the parties to help us, but the whole record is before us, so don't be concerned that we don't have access to everything. No, Your Honor. I only point it out because the excerpts of record are quite lengthy, and I wanted to point out to the Court that in applying the standard of close scrutiny and looking at the record, that it may need to, since it was designated on appeal, may need to look to the remainder of the administrative record. That is why I raise it, not to suggest the Court doesn't have access. Well, and it has been looked at. Let me ask you this. It's correct, as opposing counsel suggests, that you never had a hands-on examination of this individual, did you? You relied on other records, never asked your own independent doctor to examine. Is that right? Yes, Your Honor. And to define for our purposes today, an independent medical examination, as I'm understanding it, is sending the plaintiff to a doctor, which UNAM pays. UNAM pays that physician to conduct an examination of him. This was raised at trial, and the Court in the transcript went over it for some time with plaintiff's counsel, asking, if we have these objective tests, okay, that are not performed by the claim reviewer in this case, and which are self-evident, the results of which are self-evident, do we still need to send this person out for an independent medical examination? At that point, counsel pointed the Court to the fact that an angiogram is the only definitive example of whether there would be a blocked artery. Query whether that's true, because there's ischemia, there are other tests, there's the ECG and the stress ECG, all of which were evaluated by the Court. UNAM couldn't ask that an angiogram be performed. That's an invasive procedure. So what would the point of an IMB be? I also point out that this particular trial court is not, does not shy away from independent medical examinations. In another case, the Walker case, which was approved by this Court, it was an ERISA case, and during litigation, the trial court appointed a medical expert for purposes of clarifying and helping the Court to better understand medical issues. The Court deemed that unnecessary here and made a finding to that effect. And furthermore, it's not just Dr. Tonkin versus Dr. Wu, as it's been portrayed by plaintiff. This is Dr. Estrin, who is the Social Security Administration physician, who also reviewed the cardiac records of this plaintiff and did not list a preclusion from working under stressful conditions. We're also looking at Dr. Selvin's records. Also, no mention of not being able to work. We're also looking at Dr. Goge's records, who performed the second angioplasty. Again, no discussion of inability to work. Going back to Dr. Estrin, by the way, that evaluation by Dr. Estrin of the Social Security Administration did not preclude plaintiff from going back to work as a result of a cardiac condition. And that was after a second angioplasty in May of 2001. What is Social Security has to do with depression, right? Yes. I only point to it because we're talking about what is the medical evidence with regard to cardiac condition, and it's not just Dr. Wu versus Dr. Tonkin. And furthermore, there was a second cardiologist at Unum, and this is reflected in the Court's findings of fact, that also reviewed the records. It also wasn't just Dr. Wu reviewing the records. So going back to the weight of the evidence, the weight of the evidence is that Unum's determination was correct, and the evidence was reviewed under a de novo standard. The Court specifically addressed the concern raised by Judge Callahan, which is that as to depression, whether that was a disabling condition. Specifically, the Court made findings with regard to the Social Security Administration's report that it relied on in awarding benefits, and the Court can look to those, but found that the report was based upon plaintiff's claim that he had started taking medications for depression right after his procedure in December of 2000. The Court looked to see what medications he was taking before and after his procedure in December of 2000, and found that he was, in fact, taking antidepressants before that date. The Social Security Administration never examined records, and so found that that was not supported. Additionally, Unum had a psychiatrist look at those records, too. Also found that there was not, although on June 29, 2001, when that examination took place by Social Security Administration, there may have been sufficient grounds for depression that between January and June, or during the elimination period, which actually ended March 15, 2001, there was not evidence of depression as a disability. All right. Let me ask you this. If we're talking about this abuse of discretion with special scrutiny. I think it's close scrutiny of the record. The doctors that you say support that he could work, did any of them look at him? Had any of them actually ever seen him, or had they just reviewed records? I don't believe Dr. Estrin of Social Security Administration met with him. I believe that he reviewed records. Dr. Selvin never said one way or another that he couldn't work. Obviously did surgery on the gentleman. Well, was he asked to address that issue? I mean, how can we say from that whether you can work or not if it's not? I think that what needs to be looked at is that plaintiff has raised that Dr. Selvin's not addressing the issue should be an inference in favor of plaintiff, because he shouldn't have had to address the issue. The reality is that Dr. Selvin addressed other lifestyle changes that plaintiff needed to make. The fact that he didn't address the specific issues, you know, maybe says nothing, but certainly doesn't say the opposite. Okay. So is there anyone that is being used to support that he cannot work that actually saw him? No, Your Honor. They're based on record reviews. But again, when you're talking about someone who is recovering from an angioplasty, and again, Unum never said he doesn't have coronary artery disease. The decision was that he recovered from his angioplasty and could return to work, as he had been working with coronary artery disease for 20 years, as Dick Cheney has been working with coronary artery disease since 1978. We don't. Counsel, I think the thing that is very troubling to this Court is that this is a very sick man. And he persisted in working when he probably should not have been working. And to say that he can go back to work under stressful conditions, he's had how many open-heart surgeries, at least two? How many angioplasty procedures? It just kind of defies belief that that man is well enough to work. I mean, he could maybe stagger in there, do things, and get worse. But is it clearly erroneous that the Court so found? I mean, that's going back to this additional issue. I understand the Court's concern is that maybe, yes. I think that's what we're going to be decided. It's a very, you know, very odd record that UNAM would say this fellow can come right back into a stressful job and go on working. I mean, it's pretty hard to believe, frankly. I once had a case coming up from Social Security where they said, well, his diabetes isn't deteriorating the way he says it is. We think he's been working along. He'd better come back to work. Of course, by the time the case got to us, he was dead. I understand the Court's concern. And this may well be a case where there are two separate periods of disability with a period in the middle of non-disability. And that's been UNAM's position, that certainly when he went in for a substance procedure in May 2001, he again became disabled. When we're looking at an accumulation of medical conditions, claudication, there are four that have been identified by this. But the fact that he didn't go back to work after this, then it terminated his insurance, right? Exactly. But the argument being made by plaintiffs is that essentially the deterioration that he experienced from May onward is some evidence of the fact that he was disabled during this 90-day period. And that issue was specifically put to Dr. Tonkin. Dr. Wu picked up the telephone, called Dr. Tonkin, and said, please show me what it is you're relying upon to determine that he cannot handle stress as of this 90-day elimination period, during this relevant time period. Dr. Tonkin said, look at these reports from May of 2001. They're going to show you small vessel disease. That's why he can't handle stress. Now, other issues have already been looked at. Ischemia, that's one thing that might indicate that you can't handle stress, you're not strong enough. That is another issue. These things were all looked at. And it may well be that after May of 2001, he was disabled. But during this interim period, he was not. Dr. Wu went and got those reports. They did not reveal, and the Court found and reviewed those reports itself, the Court similarly found it did not reveal what Dr. Tonkin claimed, specifically small vessel disease. So Unum never said, you know, you're always going to be able to work with this condition. What Unum said is, let's look at the symptomology, let's look at your test results, let's look at if now you're disabled, if now is the time when you, in fact, should not be working. And ultimately, that wasn't substantiated. May well be that as of May of 2001, he shouldn't have been working. But he chose not to go back to work when he was physically capable of it. And that's what the Court found. And that is the issue before this Court. I understand that the Court has concerns. And I think that the district court below grappled with the same concerns that this Court is addressing here today. But it did so thoroughly. It did not do so in a dismissive manner. It considered all of these issues thoroughly. In fact, on the last day of trial, the Court said, I've identified six issues as I understand them. They're all issues because plaintiff has made them issues. And I want additional briefing on those issues, because they may well affect my decision in this case. Plaintiff was given every opportunity to prove his case to this Court, to the trial court below, and was unable to do so. Again, a multiplicity of conditions, if those conditions are stable, if they're being treated, if they're well treated, then that's a good sign that the heart or disease is disabling. The final point I do want to make is that the Court also should consider whether someone who doesn't make a claim for a particular condition, you know, if it's inclined to consider these additional conditions, some of which were addressed in the administrative record and by the district court, to what extent an administrator is required to guess what the claim involves. In this particular instance, the claim that was presented was for angioplasty procedure and coronary artery disease. Subsequently, records concerning depression, specifically one single report from the Social Security Administration was received. Those were also considered. There were vague references to claudication, which is muscle cramping in his legs. Those were considered to the extent that they existed. So the information was considered, but specifically he wasn't claiming disability as to any of those conditions. He was claiming disability due to the coronary artery disease and the angioplasty. So, of course, that's the focus of the administrative record. That was the focus plaintiff put on the administrative record. I did want to, if the Court has specific questions about the underlying evidence, I don't think that we need to go through it again here. It's before the Court. It's been in the plaintiff's reply brief. In trying to create an illusion of clear error here, there have been several references to the record that contain some inaccuracies, and I just wanted to point, by way of example, a couple of those inaccuracies out. Plaintiff argued in the reply brief that the January 2001 stress echocardiogram, which the Court found said was normal, essentially, that the test results were normal, that it, in fact, was abnormal. That's not accurate. Two echocardiograms were done. One was a resting echocardiogram. One was a stress echocardiogram. Both interpretations were contained in the same report. The Court specifically noted the stress echocardiogram was normal. And during trial, the Court spent a page and a half explaining to counsel why he was misreading this very document, specifically that using a term just abnormal resting ECG is insufficient. You have to read the rest of the interpretation. And I urge the Court to look at that portion of the transcript if it has concerns about the Court's findings in that regard. Secondly, plaintiff has argued that the stenting procedure during the first angioplasty in December of 2000 was ineffective, specifically that although two arteries were identified for stenting, that only one was successful. That is also inaccurate. The surgical report itself specifically shows that final injections in both arteries revealed a widely patent site without evidence of residual stenosis. It does show that they had to take a couple tries at one of the arteries, but they were both successfully stented at that time. So those are just a couple. I actually invite the Court's close review of the record in this particular instance, because the Court will see that the trial court took the same care with the record that this Court is going to and diligently combed that record. I just also wanted to address a couple of additional issues, specifically the sufficiency of Unum's denial letter, if the Court has specific questions about that. But there are cases that say, you know, if you explain what you're relying on and you spend three pages doing it and you focus on the stress factor, certainly plaintiff was on notice of what the issues were for purposes of appeal. That's our concern with the sufficiency of a denial letter. Do you have a target for your appeal? Can you perfect your appeal? That was clearly more than sufficient in Unum's denial letter. Finally, plaintiff argues that Unum was required to forward to counsel without any request by counsel to do so additional records that were generated during the administrative appeal, specifically medical reviews that were conducted. Medical reviews based on medical records that were being received. And the regulations that are referenced have to do with the appeal of an adverse benefit determination require two things. First, that the records be requested, and then they have to be sent, of course. And secondly, that everything that is submitted to a claim administrator has to be taken into account. The procedure proposed by plaintiff is a never-ending cycle where documents would be sent back to plaintiff, plaintiff would comment on them, Unum would review them again, send those reviews back to plaintiff, and there's a, there's a, it's just an unworkable proposition. Kagan. All right. Well, I'm going to ask you to wind up because your time has expired. Thank you very much. Thank you. Briefly, Your Honors. All of the additional briefing, and believe me, there was a lot of it, counsel says we were unable to prove our case. I disagree. We proved our case. I think the trial judge got it wrong. It's just that simple. Social Security, page 21 of my opening brief, talks about the records that Social Security had referring to his heart disease, and one little snip down at the bottom, deterioration likely under stressful situations. Inconsistencies, none. Claimant appears credible. No significant improvement can be expected even with treatment given history of several physical problems complicating the course of illness. And it's all cited there, Your Honor. I don't want to go through. Third, third point. If you just focus on four points in time, the December hospitalization, the January hospitalization, the May hospitalization, that's three. But there's a fourth one. It's not a hospitalization. Excerpt of record, page 1163, October of 2001, Dr. Tonkin is still responding that Mr. Silver is not well enough to go back to work. Next, the records that counsel refers to. I didn't make a big issue here because it's all in my brief. They closed the record for us, and they kept it open for themselves. There's cases on that that says you can't do that, a case out of San Diego. You just can't do it. And there are fiduciaries. You know, this is we're still trust law here. They're fiduciaries. They can't not give us records. They have to give us those records. We didn't have a chance. They talk about doctors here. We never even saw those records, and that's in my brief, too. And finally, Your Honors, I didn't mention it, but I would like to mention it, that I don't think remand is appropriate here. I think the Court's got the whole record. This man's waited close to five years now. In fact, he was only eligible for five years of disability to begin with because he goes out when he's 60 or 61, whatever it was, and he only gets paid until 65. It's only five years. So if we go back down, it's going to be another five years or whatever it's going to be, and he'll be dead. So I think the Court's got the record here. The Court can render the judgment, whatever it is. I think it should be in our favor, and that's all I have to say, unless the Court has questions. Thank you. The matter is then submitted. Thank you. United States of America v. Tai Tung Luong, 0550090.
judges: B. Fletcher, Ferguson, Callahan